IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN TORRES,<br><br>Petitioner,<br><br>vs.<br><br>WARREN MONTGOMERY, Warden,<br>Calipatria State Prison,<br><br>Respondent. | No. 2:16-cv-01245-JKS<br><br>MEMORANDUM DECISION |

Adrian Torres, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Torres is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Calipatria State Prison. Respondent has answered, and Torres has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On October 13, 2010, Torres, along with co-defendants Rudolfo Raymond Ortega, Jr., and Jesus Antonio Vidrio, was charged with the murder of Humberto Padilla (Count 1); the attempted murder of minor R.E.[1] (Count 2); and assault with a semiautomatic firearm against minor K.W. (Count 3). The information alleged as to Counts 1 and 2 that the defendants: 1) personally and intentionally discharged a firearm that proximately caused great bodily injury and death to Padilla; and 2) committed the crimes for the benefit of a criminal street gang. The information further alleged as to Count 3 that Torres and Ortega personally used a firearm. On

---

[1]     This Court will, like the California Court of Appeal, identify the living victims who were minors by their initials to protect their anonymity.

direct appeal of his conviction, the California Court of Appeal laid out the following facts

underlying the charges against Torres:

> The information was based on an incident that occurred on March 5, 2010. That afternoon, then–17–year–old Humberto "Beto" Padilla (Padilla) and his mother's boyfriend, Alton Johnson, went to Alex Guizar's grandmother's house "down the street" so that Padilla and Guizar "could straighten out whatever differences they were having in school." Padilla did not go there intending to fight Guizar and Johnson did not think there would be a fight. Johnson was a longtime friend of Guizar's family and had known Guizar for Guizar's entire life. Johnson accompanied Padilla to the grandmother's house "[j]ust to make sure that everything goes okay." At some point, the discussion between Padilla and Guizar turned into a one-on-one fist fight between them that "looked even" to Johnson. Padilla and Johnson returned home, and later that day, Padilla went out. Some testimony was presented that Padilla was a Norteño gang associate, and that the fight was over Guizar having contact with relatives who were Sureños.[FN2]

>> FN2.    Although a great deal of evidence was presented at trial relating to the gang charges, we omit most of that evidence from our facts because the jury found the gang allegations untrue.

> At about 6:30 p.m. that evening, Padilla was with K.W. and R.E.,[FN3] standing outside of a friend's house, waiting for the friend to finish showering and get ready so they could all go out together. As they waited, they had a discussion about the fight Padilla had with Guizar earlier that day. Padilla was upset because he had called K.W. and a friend to come and back him up in the fight, but the two had failed to get there in time.

>> FN3.    We will identify the living victims who were minors by their initials to protect their anonymity.

> K.W. then saw two men walk by. The individuals, who were wearing black clothing and beanies, seemed friendly, but Padilla and R.E. appeared to be suspicious of them because they did not recognize them. R.E. said, "Yo, who's that? We don't know them," or may have possibly said, "They're not from here." As the two men approached, Padilla and R.E., who had been sitting down, got up to greet them. The bigger of the two men[FN4] asked, "Hey, you all Norte?" or "you all north bay?"[FN5] R.E. replied, "Yeah, Rocky Hill Posse"—a reference K.H. did not understand, but was a reference to the Norteño gang—and then "dapped" the man's hand as a form of handshake. At that point, the two men stepped back, each pulled out a handgun, and began firing at Padilla, R.E., and K.W.

FN4.   When K.H. spoke with police, he stated that the shorter of the two men spoke.  Police described Ortega as 5'6" tall, and Torres as 5'9" tall and heavier.

FN5.   K.W. told police that the man asked, "you all north bay?"  At trial, K.W. explained that he did not know what "Norte" meant at the time, as he was relatively new to the area and uninformed about gangs.  He learned after the shooting that the incident may have been gang related and that R.E. was a Norteño.  K.W. testified that Padilla was not a Norteño.

When asked whether he saw Padilla quickly pull his hand out of his pocket, K.H. testified that he "might have," but that he did not see this occur.  K.H. testified that for the most part the shooters were aiming at Padilla, although some shots hit the side of a house and one hit R.E.  Padilla was shot in the upper left side of his back and his right buttock, and died at the hospital from gunshot wounds.  Both bullets exited the body and it was not possible to tell the caliber of the bullets that caused the wounds.  R.E., who was 15 years old at the time, was shot in the buttock.  R.E. suffered a puncture wound in his pelvis and a wound on his buttock, consistent with gunshot wounds.  He was hospitalized for five days and underwent surgery in which part of his bowel was removed and a hole in his ureter, a tube connecting the kidney to the bladder, was repaired.

K.H. testified that he was not armed that day and did not see either Padilla or R.E. with any weapons.  He testified that he ran from the scene with R.E. after the shooting and helped him to R.E.'s grandmother's house.  At that point, R.E. said, "I'll be all right. Get out of here."  As K.W. went back toward the scene of the shooting to see how Padilla was doing, he saw that police and medical personnel had already arrived.  K.W. went home because he did not want to be involved with the police.  He was also worried the shooters might have accomplices in the area, and he was afraid of having to become a witness in the case.  At trial, K.W. identified Torres and Vidrio as the shooters.  He acknowledged he did not identify either of them when asked by police shortly after the incident.  He testified he was about 85 percent certain that Torres and Vidrio were the shooters.

A resident of the Rocky Hill neighborhood testified that at about 7:40 p.m. on March 5, 2010, he was at home playing with his children when he heard gunshots and saw two men unloading two guns.  The resident ran after the men as they ran up a hill and got into a white car with tinted windows that was parked almost a block away from where the men had been shooting.  Later, the police showed the resident a car, which the resident positively identified as the white car that the men jumped into at the scene of the shooting.

Vacaville Police Officer Stuart Tan, who was on duty in an undercover capacity on the evening of March 5, 2010, testified that he heard 10 to 15 gunshots from two different guns as he walked to his unmarked vehicle.  He then heard a dispatch call that there had been a shooting, and that the suspect vehicle was a white Chevy Impala (the Impala) with tinted windows. Tan drove to an onramp to Highway 80 looking for a car that matched the description.  When he saw the Impala go by in the fast lane of the

freeway, Tan merged onto the freeway to catch up to it, get a license plate, and see who was inside. Tan saw three individuals in the car. Tan's car was not equipped with emergency lights or equipment so he was unable to pull the Impala over, but he watched as marked patrol vehicles caught up. The patrol vehicles and the Impala all exited the freeway at the Airbase Parkway exit. The Impala drove at least 45 miles per hour through a residential neighborhood before crashing into a small retaining wall at the side of a house.

The occupants ran off. The rear-seat passenger, who was identified as Torres, did not obey commands to stop and continued to fight after police caught up with him, but was eventually subdued and handcuffed. A loaded magazine was found in the Impala where Torres had been sitting; no weapons were found on him. The front seat passenger, identified as Ortega, was found in a garbage can with the assistance of a canine. Next to him in the garbage can was a black hooded sweatshirt. The driver of the Impala, identified as Vidrio, was also stopped and a search of his person revealed no weapons.

Police searched the Impala and found a black wool ski mask in the passenger door, two sets of gloves and two cell phones, and a magazine for a .9mm firearm with four bullets in it. Police found a magazine for a .9mm Taurus handgun with 12 rounds in it in the front yard where the Impala crashed.

Vacaville police officers testified that bullet casings were scattered along the sidewalk at the scene of the shootings—.9mm and .45 caliber casings from two different semi-automatic weapons. An expert in ballistics and crime scene analysis testified that the .9mm cartridge casings were fired from the Taurus .9mm semi-automatic pistol that was recovered. No firearm was available with which to compare the .45 caliber bullets that had been fired. An expert in gunshot residue received samples from the two sets of gloves that were found in the Impala and concluded there were particles of gunshot residue on both sets. DNA evidence established that Torres and Ortega had worn the gloves.

Ortega, who was 21 years old at the time of the incident, testified that he joined a Sureño gang when he was 13 years old and in foster care, and that his nickname was "Drifter" because he was always in a different home. In March 2010, he was living with Torres because he had nowhere else to live. Torres was not a gang member. Ortega testified that on March 5, 2010, he received a call from his cousin, Guizar, who was crying and said he had been beaten up and jumped by Norteños. Guizar told Ortega that he was being threatened by Norteños and that he wanted Ortega to come and get him out of the Rocky Hill neighborhood. After receiving the call, Ortega called Vidrio and told him to come pick him up. He also asked Torres to join him and Vidrio. Ortega testified that he asked Torres to come along because Torres was his friend, and also because he thought that taking a non-gang member with him would help prevent the situation from "escalat[ing]" into a "Sureño–Norteño thing." Ortega brought a gun with him because he always carried a gun for protection. He had no intentions on using it, but he "felt like [his] life [was] in danger."

Ortega testified that he told Vidrio how to get to Rocky Hill, and where to park the car. Ortega sent a text message to Guizar asking him where "they" were. He explained at trial that the "they" in the text message referred to the Norteños who were

4

threatening Guizar; he wanted to know where they were so that he could avoid them. When asked, "So . . . you're going to look for your cousin. Why didn't you ask your cousin in these text messages where he was at?", Ortega responded, "Because I thought I knew where he lived, because I kind of knew where he lived at, so I was just going off of what I was remembering. . . ." Ortega testified that he and Torres got out of the car to look for Guizar. They walked to the bottom of a hill and began to walk back toward where Vidrio had parked the car, when he heard someone yell, "[w]ho the fuck are you?" Knowing he was in enemy territory, Ortega put his hooded sweatshirt on so that the Sureño tattoos on his neck would not be visible. He stepped back and answered, "[w]ho are you."

Ortega testified that the person doing the talking stood out to him and appeared to be very aggressive. He answered Ortega's question by saying, "Rocky Hill," which Ortega took as a challenge and a threat. Another one of the three individuals said "yeah." The person who said, "yeah" had his hand hidden, as if he were holding a gun, then made a sudden move like he was pulling out a gun. Ortega was scared and shaken when he saw this, and started shooting. Ortega testified, "I felt like I had to pull my gun before it was pulled on me. So I felt like my life was in danger." After emptying his gun, he ran back up the hill to Vidrio's car, got into the car, and told Vidrio to "go." Ortega told Vidrio that he thought he had "hit" someone because he saw someone fall and get back up and run away after the shooting stopped. The police pursued him, Torres, and Vidrio, and the chase came to an end when Vidrio's car crashed. Ortega attempted to dispose of the gun by throwing it away after the crash.

Ortega initially told police he was not involved and did not know what anyone was talking about. Then he said he did not know about the gun, even though he did. Later in the interview, he started to talk about the phone call from Guizar and going to Vacaville. He lied to police for most of the interview and failed to mention self-defense because he lied about many things and did not know the law. He testified that he lied to get the interview over with, and that he kept changing the lie. When he told police that others "banged on" him, he did not mention self-defense. He repeatedly tried to end the interview. Ortega told his ex-girlfriend in a phone call that he need to pray to God for what he had done.

Torres called Dr. Robert Shomer as an expert in eyewitness identification. Shomer testified that under stress, one's process of perceiving and recording in memory does not work as accurately as they do in calm situations. Beyond 24 hours, inaccuracy in identification rises tremendously, and the presence of guns raises the stress level. He testified that if there is a hostile interaction, "there's a tremendous chance of misperception and misinterpretation of what's going on."

Torres, who was 20 years old at the time of the incident, also testified in his own defense. He testified that he grew up in an area with gang members and had friends who were Sureño or Norteño gang members, but that he had never been in a gang. In March 2010, Ortega was living in Torres's home. Torres knew Ortega was a Sureño, but Torres had never committed any crime with gang members, had never done gang graffiti, and had never gone to gang functions. On March 5, 2010, Ortega asked Torres if he would go with him to Vacaville to pick up his cousin, Guizar, who had been jumped. Torres did

not know Guizar but agreed to go.  They got in Vidrio's car and drove to Vacaville.
Torres was not familiar with the Rocky Hill neighborhood and did not think there would
be a fight or a confrontation.

Ortega gave Vidrio directions and they drove around an apartment complex two
or three times without seeing anyone.  Torres thought Ortega tried to call Guizar, but that
he could not reach him.  Torres suggested they go home but Ortega told Vidrio to stop
the car, and Torres and Ortega got out of the car.  They saw a group of people, and Torres
was a little scared and walked back a little bit.  Someone asked, "Where the fuck are you
guys from?"  Torres thought Ortega said, "Bay Area," and that one of the others said,
"Rocky Hill Posse."  He also heard someone say "Yeah."

One of the men came toward them with his hand inside his sweater.  He pulled his
hand out, and Torres thought he was going to pull out a gun.  Torres turned his back and
began to get ready to run.  He heard a gunshot, pulled out his gun, and shot as he ran.  He
testified he tried to shoot it in the air because "I didn't want to hit nobody."[FN6]  He
thought if he fired his gun, the others would get scared and stop firing.  He ran to the car
and Vidrio drove off.  Torres threw his gun out the window because he was scared and
did not want to get caught with it.  He testified that he was carrying a gun that day for
safety because he had just been jumped, robbed at gunpoint, and shot at by gang
members.  He identified the .9mm gun as his.

> FN6.   A police officer testified that a .9mm hole was found in the grill of a Ford
> Expedition, and that if a .9mm bullet had been fired into the air, it would
> not have gone into the vehicle's grill.

Vidrio testified he met Ortega in middle school or high school and knew Ortega
was a Sureño.  Vidrio had known Torres for three years; they would smoke marijuana
together.  On the afternoon of March 5, 2010, he and Ortega made arrangements to go
smoke marijuana "on the freeway."  Vidrio drove to Torres's place and picked Ortega
and Torres up.  As Vidrio drove, Ortega told Vidrio to get off the freeway in Vacaville
and gave him directions.  Vidrio was not a gang member and did not know what Ortega
and Torres were going to do.  He did not see either Ortega or Torres with guns, and
neither was wearing gloves or a hood.  Once they arrived in the location Ortega had
directed him to, Ortega and Torres left the car.  As Vidrio was about to make a phone
call, he heard gunshots, and Ortega and Torres ran up to the car.  Ortega said, "I got
somebody.  I think I shot somebody," and told Vidrio to "Go, go."  Vidrio saw Ortega
with a gun.  Vidrio did not hear Torres say anything.  When Vidrio heard sirens, he did
not pull over because Ortega had a gun and he was scared for his life.  His car crashed
and he took off running but eventually surrendered.

Michelle Vega, Ortega's sister, told police that she received a phone call from
Ortega at about 7:04 p.m. on March 5, 2010.  He appeared to be crying and upset, and she
could hear police sirens in the background.  He said he was going away for a long time,
that it was "over" for him, and that he was going to prison.  He also said the whole thing
was Guizar's fault.

*People v. Torres*, Nos. A136219, A136232, 2014 WL 7151567, at *2-5 (Cal. Ct. App. Dec. 16, 2014).

At the conclusion of trial, the jury found Torres not guilty of first-degree murder, but convicted him of second-degree murder.  The jury also convicted Torres of attempted murder and assault with a firearm, as charged in Counts 2 and 3, and found true the weapons allegations in Counts 1-3.[2]  The jury found the gang allegations to be not true.  The trial court subsequently sentenced Torres to a total determinate imprisonment term of 21 years and 4 months and a total indeterminate term of 65 years to life imprisonment.[3]

Through counsel, Torres appealed his conviction, arguing that: 1) the prosecutor committed misconduct during summation by implying that he had told a different story to police when he was interviewed on the day of the incident because there was no evidence presented to the jury that he had even spoken to police; 2) the trial court erred by refusing to allow the defense to admit evidence that R.E. possessed a gun on two dates after the incident occurred; 3) the cumulative effect of those errors warranted reversal of his convictions; 4) his aggregate sentence of 86 years and 4 months to life imprisonment constitutes cruel and unusual punishment, and counsel rendered ineffective assistance at sentencing by failing to object to the sentence as cruel and unusual.  Torres also joined in the arguments of his co-appellant Ortega.  The California Court of Appeal unanimously affirmed the judgment against Torres in a reasoned,

---

[2]      The jury convicted Ortega of the same offenses and also found true as to Ortega the weapons allegations in Counts 1-3.  The jury acquitted Vidrio of Counts 1, 2, and 3 but found him guilty of evading an officer and driving with willful disregard (Count 4), which was charged against Vidrio alone.

[3]      Ortega received the same sentence.  Vidrio was sentenced to 3 years' imprisonment on his conviction for evading an officer and driving with willful disregard.

unpublished opinion issued on December 16, 2014.  *Torres*, 2014 WL 7151567, at *13.[4]  Torres

petitioned for review in the California Supreme Court, which was summarily denied on March

11, 2015.  Docket No. 19-8 at 300.

Torres then filed a counseled petition for habeas relief in the Solano County Superior

Court.  In that petition, Torres alleged that: 1) trial counsel was ineffective for failing to

investigate and present a post-traumatic stress disorder ("PTSD") expert to testify that Torres

shot the victims because of a genuine but unreasonable belief that his life was in danger which

was prompted by his repeated prior encounters with gang members that rendered him prone to

violent overreaction; 2) the trial judge erred by failing to properly instruct the jury on lesser-

included offenses to the murder charges; and 3) the trial court failed to include the portion of

CALCRIM No. 520 that states that murder must be "without lawful excuse or justification."  The

superior court denied the petition on July 25, 2016, after concluding that Torres failed to state a

*prima facie* case for relief on any of his claims.  Docket No. 19-8 at 303.

While his state habeas petition was pending in the superior court, Torres timely filed a

counseled Petition for a Writ of Habeas Corpus in this Court on June 6, 2016.  Docket No. 1

("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).  Respondent moved to dismiss for failure to exhaust

state court remedies.  Docket No. 9.  In response, Torres moved to stay his Petition, which

Respondent did not oppose.  Docket Nos. 10, 11.  This Court, through a previously-assigned

magistrate judge, stayed these proceedings pending exhaustion.  Docket No. 13.

---

[4]    The Court of Appeal also unanimously affirmed the judgment against Ortega.
*Torres*, 2014 WL 7151567, at *13.

Torres then filed a counseled habeas petition in the California Court of Appeal, raising the same ineffective assistance and instructional error claims he had raised in his habeas petition in the superior court.  The Court of Appeal denied the petition without comment on September 7, 2016.  Docket No. 19-8 at 372.

Torres raised the same claims to the California Supreme Court in a "petition for review after denial of petition for writ of habeas corpus."  The Supreme Court similarly denied the petition without comment on November 9, 2016.  Docket No. 19-8 at 429.

Following the Supreme Court's denial, this Court lifted the stay and ordered a response. Docket No. 15.  Briefing is now complete, and the case is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his counseled Petition before this Court, Torres argues that: 1) trial counsel rendered ineffective assistance by failing to investigate and present expert PTSD testimony; 2) the trial court failed to properly instruct the jury on murder and on lesser-included offenses; 3) the prosecutor committed misconduct in closing by making false and prejudicial comments as to Torres' alleged statements to police; 4) Torres' rights to due process and to present a defense were violated by the trial court's exclusion of evidence that one victim possessed a gun on two subsequent occasions; 5) the cumulative effect of the errors warranted reversal of his conviction; 6) Torres' aggregate sentence of 86 years and 4 months to life imprisonment constitutes cruel and unusual punishment; and 7) alternatively, counsel was ineffective at sentencing for failing to object to the sentence as cruel and unusual.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that

contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives

at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a

common term in the legal world.  The Supreme Court has cautioned, however, that the range of

reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly

established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating

whether a rule application was unreasonable requires considering the rule's specificity.  The

more general the rule, the more leeway courts have in reaching outcomes in case-by-case

determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

IV. DISCUSSION

1. <u>Ineffective Assistance of Counsel–PTSD Expert Testimony</u> (Ground 1)

Torres first faults trial counsel for failing to consult and retain an expert to opine that Torres suffered from post-traumatic stress disorder ("PTSD").  At trial, Torres testified that he had previously been jumped, robbed at gunpoint, and shot at by gang members, after which he started carrying a gun for safety.  According to Torres, a PTSD expert would have explained that his past trauma from those experiences caused him to become hypervigilant such that he believed the Nortenos would kill him.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Torres must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

The Ninth Circuit remains sensitive to the issue of retaining and consulting with defense experts.  *See, e.g.*, *Weeden v. Johnson*, 854 F.3d 1063, 1070-71 (9th Cir. 2017) (holding that trial counsel was deficient in failing to seek psychological evaluation about effect of petitioner's youth on her mental state); *Richter v. Hickman*, 578 F.3d 944, 953-54 (9th Cir. 2009) (en banc) (trial counsel's failure to consult an expert in blood evidence constituted ineffective assistance), *rev'd by Harrington v. Richter*, 562 U.S. 86 (2011).  The cases finding ineffective assistance based on defense counsel's failure to consult with an expert or offer expert testimony appear to involve situations where the prospective defense expert testimony would: 1) exonerate the defendant; 2) conflict with powerful expert testimony offered by the Government;

3) significantly weaken adverse Government expert testimony; and 4) aid in preparing defense counsel's cross-examination of the adverse Government expert testimony.

Here, however, Torres fails to show that counsel did not have a valid reason for pursing a different defense strategy, or that the now-proffered PTSD testimony would have led to a better outcome in his case.  At trial, Torres testified that he fired his gun at in the air solely to scare the victims and make them back away, and that he did not want to shoot anyone.  Although that theory ultimately proved unsuccessful with the jury, Torres fails to show that counsel's reliance on that theory was deficient, or that a theory based on PTSD testimony would have been successful.  As the superior court explained in rejecting this claim on habeas review:

> Petitioner alleges that he admitted to shooting the victims at trial, and therefore the only issue was his mental state at the time of the crime.  However, this is simply incorrect: Petitioner testified at trial that he shot into the air while running away, and specifically that he did *not* shoot the victims.  In the circumstances, it was not deficient for Petitioner's trial counsel to take Petitioner at his word and pursue a strategy aimed at bolstering Petitioner's claim.  There was no reason for Petitioner's trial counsel to have pursued a PTSD-based defense when Petitioner unequivocally denied having shot the victims.
>
> The PTSD testimony Petitioner now alleges his trial counsel should have presented would have undermined his defense that he made a conscious choice to shoot in the air in order to try to scare off the victims without harming them; according to the expert, those suffering from PTSD react instinctively to what they perceive as danger, without conscious decision-making.  Therefore, even if trial counsel had consulted with a PTSD expert, there is no indication he would have used his testimony at trial, or altered his trial testimony in any way.  The choice of what strategy to pursue at trial is one for trial counsel, and courts will not second-guess trial counsel's reasonable tactical decisions.  Although Petitioner's trial counsel declares he had no tactical reason for not consulting a PTSD expert, he does not state that he would have used such testimony, or explain how it could have bolstered Petitioner's own testimony that he did not shoot the victims.  Petitioner and trial counsel chose to present a defense that Petitioner had not shot the victims; that choice was a rational, tactical one that is not subject to judicial second-guessing.

The California Superior Court's conclusion is both reasonable and fully supported by the record, which shows that Torres testified that he fired "[k]ind of in the air, to shoot in the air . . . . [b]ecause I didn't want to hit nobody.  I didn't want to shoot nobody."

Moreover, it is notable that the trial court instructed the jury as to both self-defense, which requires both a reasonable belief that the defendant was in imminent danger of being killed or suffering great bodily injury and a reasonable belief that immediate use of deadly force was necessary to avoid that danger, and imperfect self-defense, where the defendant actually believes there is imminent danger that requires the immediate use of deadly force, but at least one of those beliefs are unreasonable.[5]  Ortega asserted self-defense at trial.  He testified that he started shooting because he saw Padilla pull out his hand, and Ortega thought he was drawing a gun.  Ortega testified that he emptied his gun, and thought he fired seven rounds.  In arguing self-defense on summation, Ortega's counsel asked the jury to think about Ortega –"his background, what he heard, what he saw, and how he reacted, and why he reacted."

Although Torres' main defense was that he did not shoot directly at Padilla, defense counsel also referred to self-defense on summation.  Torres' counsel argued that the jury should assess Torres' actions in light of the circumstances of that night, including the neighborhood where the shooting occurred.  He continued:

> Now, the judge is not going to tell you that there's a rule of law and that there's a requirement that you have to roll the dice before defending yourself.  That's not the law in the United States.  You don't have to wait to be injured before you can resort to violence.  Understand, if you believe Mr. Torres' testimony, and I–and his testimony was believable, was that the minute he saw that reach, he started running and firing.  Now,

---

[5]     Under California law, "[a] defendant who kills with this genuine but unreasonable fear can be found guilty of no more than manslaughter."  *Menedez v. Terhune*, 422 F.3d 1012, 1023 (9th Cir. 2005).

what angle his arm was at, I don't know.  But he is certain, and I think you can be certain, that he didn't shoot towards those people.

Now, as to that–I'd like to paraphrase the actual instruction.  And I'm paraphrasing a little bit, but: Actual danger is not necessary to justify self-defense.  If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an actual belief and fear that he is about to suffer bodily injury, and if a reasonable in a like situation, seeing and knowing the same facts, would be justified in believing himself in danger, and that individual, so confronted, acts in self-defense upon these appearances and from that fear and actually believes, the person's right of self-defense is the same whether the danger is real or merely apparent.

In his Traverse, Torres attaches a new declaration from the proposed PTSD expert, Dr. Kevin Booker, dated March 20, 2017, after all habeas petitions in the state court had been denied.[6]  Docket No. 21 at 43-45.  In the declaration, Dr. Booker takes issue with Respondent's contention, based upon the superior court's determination, that "because Torres fired his gun up in the air, 'all' of his decision-making was under his conscious control."  *Id.*  According to Dr. Booker, "[a] person can engage in very specific and deliberate acts or actions while the fight mechanism is activated; this doesn't deem that behavior conscious or appropriate just because it was initiated. . . .  People can engage in fight or defensive behaviors while in a state of panic and

---

[6]      Although Torres did not present this declaration in his habeas petitions in the state courts, "new factual allegations do not ordinarily render a claim unexhausted."  *Beatty v. Stewart*, 303 F.3d 975, 989 (9th Cir.2002), *cert. denied* 538 U.S. 1053 (2003).  A claim is unexhausted only if new factual allegations "fundamentally alter the legal claim already considered by the state courts."  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).  It is not necessary that "every piece of evidence" supporting federal claims have been presented to the state court.  *Chacon v. Wood*, 36 F.3d 1459, 1469 n. 9 (9th Cir.1994), *superceded by statute on other grounds as stated in Hall v. Los Angeles*, 697 F.3d 1059, 1070 (9th Cir. 2012).  The introduction of new evidence effects the fair presentation requirement when it "substantially improves the evidentiary basis" for a petitioner's claims.  *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988).  New factual allegations that are merely cumulative of those presented to the state court do not transform the claim and thus do not require exhaustion.  *Hillery v. Pulley*, 533 F. Supp. 1189, 1200-02 (E.D.Cal. 1982), aff'd, 733 F.2d 644 (9th Cir. 1984), aff'd, 474 U.S. 254 (1986); *see also Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) (acknowledging that although the "precise factual predicate" for a claim had changed after the evidentiary hearing in federal court, the claim remained rooted in the same incident and was therefore exhausted).

shock such that, after the fact, they have no clear recollection of what they actually did during the fight.  This is known as peri-traumatic amnesia." *Id.*

Dr. Booker's declaration raises the questions whether the state courts erred in denying Torres' ineffective assistance claim without holding an evidentiary hearing, and whether this Court should hold an evidentiary hearing on federal habeas review.  On one hand, because Torres did not present this specific opinion to the state courts, one could argue that he failed to develop the factual basis of the ineffective assistance claim in the state court proceedings, within the meaning of § 2254(e)(2).  Under that provision, a federal court cannot hold an evidentiary hearing on the factual basis of a claim that was not developed in state court unless the applicant shows that:

> (A) the claim relies on –
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

Torres provides no reason to believe that the opinion is based on any information developed after the habeas petitions were filed in the California Court of Appeal and the California Supreme Court and, as discussed *infra*, the opinion is not sufficient to satisfy § 2254(e)(2)(B).

On the other hand, Torres' state habeas petitions requested an evidentiary hearing, and Dr. Booker's proffered declaration is the type of evidence that could come out at such hearing. Where the petitioner was prevented from developing the factual basis of his claim, however, he

must nonetheless make a colorable claim for relief to receive an evidentiary hearing in federal habeas proceedings.  To allege a colorable claim, the petitioner must allege facts that, if true, would entitle him to habeas relief.  *West v. Ryan*, 608 F.3d 477, 485 (9th Cir. 2010).  Here, however, the new allegation in Dr. Booker's declaration (that Torres could intend to shoot away but still involuntary shoot Padilla as a result of his PTSD) is insufficient to render the state courts' rejection of Torres's ineffective assistance claim unreasonable because Torres fails to show that, if counsel had presented this PTSD testimony and relied more heavily on a self-defense theory, a better outcome was reasonably likely to result.  *See Strickland*, 466 U.S. at 687 (requiring petitioner claiming ineffective assistance of counsel to show deficient performance that prejudiced the defense).

As noted above, the jury was instructed on both self-defense and imperfect self-defense, and defense counsel referred to self-defense in assessing Torres' actions during the incident. Torres also testified that he had previously been jumped, robbed at gunpoint, and shot at by gang members, although he was not a gang member himself, which could have led the jury to believe that Torres was hypervigilant, as Dr. Booker suggests.  Torres fails to show a reasonable likelihood that the addition of Dr. Booker's opinion on these topics would have led the jury to accept a defense theory that it otherwise rejected, and also rejected as to Ortega.  Torres is therefore not entitled to an evidentiary hearing on his ineffective assistance claim in any event, and he is not entitled to relief on it either.

2.    <u>Instructional Errors</u> (Ground 2)

Torres next argues that the trial court committed two errors when instructing the jury. Specifically, Torres avers that the trial court should have *sua sponte* instructed the jurors on CALCRIM No. 640, which informs the jury of the process for deciding the lesser-included offenses, and that Torres's due process rights were violated by the court's failure to specifically include as an element of murder whether the defendant killed without lawful excuse or justification.

Because jury instructions in state trials are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471 U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*.

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). "[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). A federal habeas court "must determine whether there was a reasonable likelihood that the jury understood the instruction to allow a conviction predicated on proof that was insufficient to meet the requirements of due process." *Lisenbee v. Henry*, 166 F.3d 997, 999 (9th Cir. 1999) (*citing Ramirez v. Hatcher*, 136 F.3d 1209, 1213 (9th Cir. 1998)).

The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

As an initial matter, Respondent urges the Court to find that Torres's instructional error

claims are procedurally defaulted.  As a general rule, a federal court will not review a claim if

the state court's rejection of the claim rests on a state law ground that is independent of the

federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722,

729-30 (1991).  Here, the superior court found the underlying instructional error claim to be

barred because it could have been but was not raised on direct appeal.  *See In re Dixon*, 264 P.2d

513, 514 (Cal. 1953) ("The general rule is that habeas corpus cannot serve as a substitute for an

appeal, and, in the absence of special circumstances constitu[t]ing an excuse for failure to

employ that remedy, the writ will not lie where the claimed error could have been, but were not,

raised upon a timely appeal from a judgment of conviction."); *see also In re Seaton*, 95 P.3d 896,

901 n.4 (Cal. 2004) ("What we mean when we invoke the *Dixon* bar is that the claim is *based on*

*the appellate record*, and thus was fully cognizable on appeal insofar as it was preserved at

trial.").

California's *Dixon* bar has been upheld as an adequate and independent procedural

ground capable of barring federal habeas review.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1806

(2016).  In any event, even if such bar did not exist, Torres is not entitled to relief on the merits

of his claims.  On habeas review, the superior court considered the instructional error claims as

raising "ineffective assistance of appellate counsel claim, given that they could have been raised

on direct appeal." Ex. 11 at 3 (citing *In re Harris*, 855 P.2d 391 (Cal. 1993)). The superior court

found the claims without merit for the following reasons:

> Both of these claims fail because the trial judge instructed the jury that: "You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed. I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide. I will also instruct you on the different types of murder and manslaughter." (Transcript at 1702.) The trial judge also instructed the jury on the substantive elements of each possible lesser included offense. (Transcript at 1702-1712.) Even if it was error not to have provided more specific instructions either on lesser included offenses or to have included the "killed without lawful excuse or justification" portion of CALCRIM 520, any error was harmless because the jury would have understood from these other instructions its duty to determine whether the killing was unlawful, and its duty to determine what specific crime was committed. There is no probability that more thorough instructions on either of these points would have led to [Torres] obtaining a more favorable result absent the error. (See *People v. Braverman* (1998) 19 Cal. 4th 142, 178.) Because neither of these instructional claims are meritorious, appellate counsel's failure to argue them on appeal was not ineffective assistance of counsel. (See *In re Richardson* (2011) 196 Cal. App. 4th 647, 660.)

As previously mentioned, a claim of jury instruction error is likewise reviewed under a

harmless error standard on federal habeas review. *Evanchyk v. Stewart*, 340 F.3d 933, 940-41

(9th Cir. 2003). Habeas relief is only available where the error had a "substantial and injurious

effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht*,

507 U.S. at 637; *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The relevant question is

"whether the instructions as a whole are misleading or inadequate to guide the jury's

deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010).

On independent review, this Court likewise concludes that any instructional error was

harmless in light of the other jury instructions given. The Court of Appeal's harmlessness

determination is both reasonable and fully supported by the record. Torres has not established

any likelihood that he was prejudiced by the given instructions or that the jury would have

reached a different verdict had it received the specific charge he now requests. *Brecht*, 507 U.S.
at 637.  The Court thus finds no basis to believe that Torres's conviction was the result of an
"extreme malfunction" of the state criminal justice system." *Harrington v. Richter*, 562 U.S. 86,
102 (2011).  Torres is not entitled to relief on his instructional error claim, and for the same
reasons, he fails to show that he was prejudiced by counsel's failure to raise the instructional
errors on direct appeal.  *See Strickland*, 466 U.S. at 687, 697 (to demonstrate ineffective
assistance of counsel, a defendant must show both that his counsel's performance was deficient
and that the deficient performance prejudiced his defense; courts may consider either prong of
the test first and need not address both prongs if the defendant fails on one).

3.    <u>Prosecutorial Misconduct</u> (Ground 3)

      Torres additionally contends that the prosecutor committed misconduct by implying in
summation that Torres had told a different story to police when he was interviewed on the day of
the incident than the story he testified to at trial.  Torres raised this claim on direct appeal, and
the Court of Appeal laid out the following facts underlying this claim:

> During closing, the prosecution argued, "Let's take some of the defense
> witnesses, and we're going to view all of them with the same critical eye.  [¶]  Who has a
> motive to lie in this case?  Who had the time to, quote, backfill their story, as Dr. Shomer
> told you. Well, I don't know.  The defendants had two years to do that, because they
> surely didn't tell this version of the story that you heard to the police when they were
> interviewed on the day of the crime . . . ."  Torres's counsel and Vidrio's counsel each
> objected without stating a reason, and the trial court overruled the objections.  The trial
> court overruled two additional objections from Vidrio's counsel—"[m]isstates [sic] facts
> not in evidence" and "[p]rosecutorial misconduct"—and denied a request from Vidrio's
> counsel for a limiting instruction.  The prosecutor continued, "So you take into
> consideration who was telling you the truth and who had motive to not tell you the truth.
> The defendants are the only ones that had a motive to not tell you the truth.  They're on
> trial there.  They had two years to think about what they were going to say, two years to
> look over the evidence and make decisions on what they were going to tell you."

*Torres*, 2014 WL 7151567, at *10.

Torres argues, as he did on direct appeal, that, because no evidence was presented to the jury that he had even spoken to the police, the prosecutor committed misconduct by implying that he had told a different story when he was interviewed on the day of the incident.  Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

Under clearly established federal law, a prosecutor's incorrect and improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam) (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)); *see Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000).  In determining whether the prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the context of the entire proceeding.  *Boyde*, 494 U.S. at 385; *Darden*, 477 U.S. at 179-182.  Even when prosecutorial misconduct rises to the level of a due process violation, such misconduct provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993).  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004).

24

Torres fails to satisfy these heavy burdens.  As the Court of Appeal explained in rejecting

this claim on direct appeal:

>       As noted, "a court should not lightly infer that a prosecutor intends an ambiguous
> remark to have its most damaging meaning or that a jury, sitting through lengthy
> exhortation, will draw that meaning from the plethora of less damaging interpretations."
> (*Donnelly v. DeChristoforo*, *supra*, 416 U.S. at p. 647.)  Here, the prosecutor's
> undifferentiated reference to "the defendants" was ambiguous.  It could have meant two
> of the defendants, or all three.  The trial court properly instructed the jury to decide the
> facts based only on the evidence, which the court defined to specifically exclude anything
> the attorneys said in their closing arguments.  Having heard only evidence of Ortega and
> Vidrio being interviewed on the day of the crime, and having heard no evidence that
> Torres was ever interviewed, a reasonable jury would have determined that the
> prosecutor was referring only to Ortega and Vidrio, and not Torres.
>       The record supports a conclusion that the jury would have been particularly likely
> to interpret the prosecutor's argument to refer only to Ortega and Vidrio because, after
> arguing "the defendants" told the police a different story from what they said at trial, the
> prosecutor explained, "Mr. Ortega never tells the police that he was acting in self
> defense. [¶] Mr. Vidrio never tells the police that he's just out for a ride . . . ."  She made
> no mention of Torres as having spoken to the police, thereby suggesting that it was
> Ortega and Vidrio, and not Torres, to whom the prosecutor was referring when she said
> "the defendants."  In addition, the trial court instructed in one of its jury instructions:
> "You have heard evidence that *defendants Rudolfo Ortega and Jesus Vidrio* made
> statements before trial.  You may consider that evidence only against the defendant who
> made the statement and not against any other defendant." (Italics added.)  Another jury
> instruction stated in part: "If *the defendants Rudolfo Ortega and/or Jesus Vidrio* made a
> false or misleading statement before this trial . . . knowing the statement was false or
> intending to mislead, that conduct may show he was aware of his guilt of the crime and
> you may consider it in determining his guilt.  You may not consider the statement in
> deciding any other defendant's guilt . . . ."  Those instructions also assisted the jury in
> reasonably determining that the statements to which the prosecutor referred must have
> been statements made by Ortega and Vidrio, and not Torres.
>       Moreover, any error was harmless under any standard because the evidence
> refuted Torres's claim of self-defense as overwhelmingly as it did Ortega's.  Torres
> accompanied his housemate, a known Sureño gang member, to a Norteño area in
> Vacaville, carrying a loaded gun, yet claimed he did not think there would be a fight or a
> confrontation.  He believed they were there merely to "pick up" Guizar, and that he did
> not realize Ortega was armed.  Torres testified that he began shooting only after he had
> his back turned and heard a gunshot, and thought it was Padilla who was shooting.  He
> testified that he shot in the air, but there was evidence that multiple bullets from the gun
> that he admitted he carried with him that day were found in areas, including the grill of a
> car, that the bullets would not have gone into if they had been fired into the air.  Given

these incongruities, and the overwhelming evidence against him, any error would have
been harmless beyond a reasonable doubt.

*Id.* at 10-11.

The Court of Appeal's conclusion is both reasonable and fully supported by the record.

It does not contravene, or unreasonably apply, clearly-established federal law, and Torres is not

entitled to relief on this ground.

4.      Evidentiary Error (Ground 4)

Torres also claims that the trial court violated his right to due process when it excluded

from trial evidence that R.E. possessed a gun on two dates after the offenses at issue.  The Court

of Appeal considered and rejected this claim on direct appeal as follows:

>       We conclude there was no error because the proffered evidence was not relevant.
> Appellants assert that the proffered evidence could have assisted the defense in
> demonstrating that they believed that one of the three individuals—Padilla, K.H., or
> R.E.—had a gun, and that they therefore reasonably acted in self-defense.  Ortega relies
> on *People v. Shoemaker* (1982) 135 Cal. App. 3d 442, but that case refutes appellants'
> claim.  The court in that case stated, "Character at an earlier or later *time* than that of the
> deed in question is relevant *only on the assumption that it was substantially unchanged in
> the meantime*, *i.e.* the offer is really of character at one period to prove character at
> another, and the real question is of relevancy of this evidence to prove character, not of
> the character to prove the act."  (*Id.* at p. 447, italics added.)  Here, the proffered
> evidence showed at most that R.E. was "a gun carrying gang member" *in 2011 and 2012*,
> after the charged crimes.  R.E.'s father reported to probation after the incident, "even
> though I didn't lose my son, I lost my son," referring to how R.E.'s personality, outlook
> on life, and behavior, had changed after the incident in which he was shot and severely
> injured by appellants, at least one of whom was a Sureño.  The proffered evidence
> showed nothing more than that R.E. had become "a gun carrying gang member" by 2011
> and 2012, not that he was more likely to have been one at the time of the shooting in
> 2010.  In other words, the evidence was irrelevant because the defense failed to show that
> R.E.'s character was "substantially unchanged" after—or by—the shooting.  (*Id.* at p.
> 445.)
>       Even assuming the evidence had some relevance, we would conclude it was only
> minimally relevant, and agree with the trial court that any probative value was far
> outweighed by its potential for confusing the jury and consuming time as the parties
> would have had to adjudicate the facts of the subsequent events.  Accordingly, the trial
> court did not abuse its discretion in excluding the evidence as substantially more

prejudicial than probative.  (*See* EVID. CODE, § 352.)  Because there was no error under
state law, appellants' constitutional claims also fail.  (*See People v. Linton* (2013) 56 Cal.
4th 1146, 1202.)  Finally, we conclude that any error was harmless because, as stated
above, there was overwhelming evidence that appellants did not act in self-defense.

*Torres*, 2014 WL 7151567, at *11-12.

Torres fares no better on federal habeas review.  It is well-settled that, under the Sixth

Amendment, an accused has the right to present witnesses, testimony and other evidence in his

defense.  *See Washington v. Texas*, 388 U.S. 14, 19 (1967).  However, "[t]he accused does not

have an unfettered right to offer testimony that is incompetent, privileged, or otherwise

inadmissible under standard rules of evidence."  *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988).

States have considerable latitude under the Constitution to establish rules excluding evidence

from criminal trials.  *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006).  "Thus, a trial judge may

exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion

of the issues, or misleading the jury.  The trial judge enjoys broad latitude in this regard, so long

as the rulings are not arbitrary or disproportionate."  *Menendez v. Terhune*, 422 F.3d 1012, 1033

(9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding

due process rights are not violated by exclusion of relevant evidence where probative value is

outweighed by danger of prejudice or confusion).

Under these guidelines, this Court cannot find that the trial court's denial of Torres's

request was an abuse of discretion or unreasonable or contrary to federal law.  As an initial

matter, the Supreme Court has not yet "squarely addressed" whether a state court's discretionary

exclusion of evidence can ever violate a defendant's right to present a defense.  *See Moses v.*

*Payne*, 555 F.3d 742, 758-59 (9th Cir. 2008) (considering challenge to state evidentiary rule

allowing discretionary exclusion of expert testimony favorable to defendant); *see also Brown v.*

*Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that no Supreme Court case has squarely addressed this issue since *Moses*).  Thus, the state court's decision could not have contravened clearly established federal law under AEDPA.  *Id.*; *see Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008).

Moreover, to the extent that clearly established federal law is implicated by such a claim, federal law requires that a petitioner demonstrate that the trial court excluded "trustworthy and necessary exculpatory testimony."  *Cudjo v. Ayers*, 698 F.3d 752, 754 (9th Cir. 2012) (citing *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973).  A petitioner must show that the third-party evidence was "inconsistent with" and "raise[d] a reasonable doubt of" his guilt.  *Holmes*, 547 U.S. at 327.  Torres fails to meet this standard as the excluded evidence did not tend to prove or disprove a material fact in issue at his trial.

Finally, the trial court acted well within its discretion and within the bounds of the Confrontation Clause in determining that the limited probative value of the evidence was outweighed by the undue consumption of time that the presentation of such evidence would require as well as the danger of confusion to the jury.  *See United States v. Scheffer*, 523 U.S. 303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to distract the jury from its central function of determining guilt or innocence").  The trial court properly determined that evidence of R.E.'s subsequent gun possession did not have sufficient bearing on R.E.'s character at the time of the shooting in 2010.  For the foregoing reasons, Torres is not entitled to relief on this claim.

5.      Cumulative Error (Ground 5)

Torres further contends that the cumulative effect of the errors enumerated in Grounds 1

through 4, *supra*, warrant reversal of his conviction.  The Ninth Circuit has stated "[t]he

Supreme Court has clearly established that the combined effect of multiple trial court errors

violates due process where it renders the resulting trial fundamentally unfair."  *Parle v. Runnels*,

505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973));

*see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000).  "Cumulative error

applies where, although no single trial error examined in isolation is sufficiently prejudicial to

warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant."

*Jackson v. Brown*, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting *Whelchel v. Washington*, 232

F.3d 1197, 1212 (9th Cir. 2000)).  Where "there are a number of errors at trial, 'a balkanized,

issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all

the errors in the context of the evidence introduced at trial against the defendant."  *United States

v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d

1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no

single error amounts to a constitutional violation or requires reversal, habeas relief is warranted

only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th

Cir. 2011) (citing *Chambers*, 410 U.S. at 298, 302-03).  Such "infection" occurs where the

combined effect of the errors had a "substantial and injurious effect or influence in determining

the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).  In other

words, where the combined effect of individually harmless errors renders a criminal defense "far

less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 410 U.S. at 294.

As discussed throughout this opinion, Torres does not demonstrate federal constitutional errors that would establish prejudice in the aggregate.  *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").  Torres is therefore not entitled to relief on this claim.

6.      <u>Sentencing–Cruel and Unusual Punishment/Ineffective Assistance</u> (Grounds 6, 7)

Finally, Torres challenges the legality of his sentence and faults trial counsel for failing to object to it as cruel and unusual punishment in light of his relative youth at the time of the crimes, and the facts that he did not intend to kill and had no prior criminal convictions.  The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).  In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts.  *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).  Where the crime is murder, even a life sentence without parole is not grossly disproportionate.  *See Harris v. Wright*, 93 F.3d 581, 584 (9th Cir. 1996) (life imprisonment without possibility of parole for aggravated first-degree murder raises no inference of gross disproportionality); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under *Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment.").  Furthermore, while the contours of the "gross disproportionality

principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case. *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

Within the last several years the United States Supreme Court has considered a number of Eighth Amendment cases involving juvenile offenders, that is, defendants who were under the age of 18 at the time they committed their offenses. In *Roper v. Simmons*, 543 U.S. 551, 575 (2005), the Supreme Court held that "the death penalty is disproportionate punishment for offenders under 18." The Supreme Court subsequently held in *Graham v. Florida*, 560 U.S. 48, 75 (2010), that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." In *Miller v. Alabama*, 567 U.S. 460, 476 (2012), a case involving a juvenile who was 14 years old at the time he committed a murder, the Supreme Court held that a mandatory sentence of life without the possibility of parole violates the Eighth Amendment where a sentencing court has no discretion to consider the defendant's youth or other "mitigating qualities."

Although Torres stresses his young age at the time of the crimes,[7] the fact remains that he was legally an adult when he engaged in a felony that resulted in murder. The state appellate

---

[7]     The record is not clear as to Torres's age at the time of the crimes. His petition states that he was 19 years old, while the Court of Appeal's opinion refers to his age as 20. Regardless, it is indisputable that Torres was legally an adult when he committed these crimes.

court's decision therefore does not run afoul of *Miller*.  Moreover, he was not sentenced to the death penalty or life without parole ("LWOP").[8]

In support of his claim, Torres cites California cases in which the California Supreme Court held that potential life sentences imposed on youthful offenders (*i.e.*, sentences where the defendant will not be eligible for parole within their life expectancy) constitutes cruel and unusual punishment.  Petition at 62.  However, in light of the applicable United States Supreme Court authority, it was not unreasonable for the state court to conclude that neither Torres' lack of intent or criminal history, nor his age at the time of the offense, rendered his sentence disproportionate to her crimes.  *See Harmelin*, 501 U.S. at 1004 (Kennedy, J., concurring) (stating that "no sentence of imprisonment would be disproportionate" for the crime of felony murder even though it does not require the specific intent to kill (quoting *Solem v. Helm*, 463 U.S. 277, 290 n.15 (1983))); *see also Martinez v. Duffy*, No C-13-5014, 2014 WL 547594, *1-2 (N.D. Cal. Feb. 7, 2014) (finding that a sentence of 25 years to life for murder as an aider and abettor committed when the petitioner was 17 years old was not cruel and unusual and thus concluding that a state court decision to that effect did not warrant relief pursuant to § 2254(d)); *Khalifa v. Cash*, No. ED CV 10-1446, 2012 WL 1901934, at *30-33 (C.D. Cal. Apr 10, 2012) (finding that a sentence of 25 years to life for first degree murder did not violate the Eighth Amendment where the petitioner was 15 years old at the time of his offense and was not the

---

[8]    Even if Torres's lengthy sentence could be considered the functional equivalent of LWOP, *see Moore v. Biter*, 715 F.3d 1184, 1191-92 (9th Cir. 2013), he is nonetheless not entitled to relief because the U.S. Supreme Court has not clearly-established that LWOP sentences are unconstitutional for adult offenders who commit violent crimes; indeed, as discussed *supra*, has upheld the constitutionality of such sentences where the crime is murder. *See Harmelin*, 501 U.S. at 957.

actual murderer but was only a lookout for the underlying felony which resulted in a murder), *report and recommendation adopted*, 2012 WL 1901932 (C.D. Cal. May 24, 2012)).

Nor can Torres demonstrate that his is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime and relevant criminal history.  As the Court of Appeal explained:

> Torres notes only the factors arguably in his favor: that he was 20 years old at the time of the crimes, did not intend to kill, and had no previous criminal convictions.  He fails to mention that there was ample evidence that the shootings were a planned, surprised attack that killed one teenager, severely wounded another, and narrowly avoided injuring a third.  There was evidence that Torres fired his gun approximately ten times, and not in the air as he claimed he had done.  Given the severity of the injuries and death he caused, and the further injuries he could have caused, a de facto sentence of life without parole is not grossly disproportionate to his culpability.

*Torres*, 2014 WL 7151567, at *12.

In short, the Court of Appeal's finding that the trial court's sentence was not grossly disproportionate to the crimes for which Torres was convicted in light of the circumstances of the instant offense was not contrary to, or an objectively unreasonable application of, any clearly established federal law and was not based upon an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Torres is not entitled to habeas relief on his Eighth Amendment claim.

## V. CONCLUSION AND ORDER

Torres is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: May 18, 2020.

　　　　　　　　　　　/s/James K. Singleton, Jr.　　　　　　
　　　　　　　　　　JAMES K. SINGLETON, JR.
　　　　　　　　　Senior United States District Judge